**Opinion issued July 5, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00036-CV

———————————

## IN THE INTEREST OF R.N.W., a Child

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Case No. 0037937**

---

## MEMORANDUM OPINION

D.C.W. appeals the trial court's termination of his parental rights to his child, R.N.W. In four issues, D.C.W. argues that the evidence was legally and factually insufficient to support: (1) termination of his parental rights under Family Code § 161.001(1)(N), (O), or (Q); and (2) the trial court's finding that termination

of his parental rights was in R.N.W.'s best interest.  *See* TEX. FAM. CODE ANN. §
161.001(1)(N), (O), (Q) (West. Supp. 2012).  We affirm.

## Background

R.N.W. was born on December 1, 1999.  In July 2000, the trial court entered
an order establishing the parent-child relationship between R.N.W. and her father,
D.C.W.  On August 25, 2000, D.C.W. was arrested and charged with assaulting
R.L.B., R.N.W.'s mother.  D.C.W. subsequently pleaded guilty to the assault
charge and was sentenced to eight years' imprisonment.  D.C.W. was released in
2008, and, two years later, he was arrested for assaulting R.L.B. a second time.
D.C.W. pleaded guilty to assault against a family member and was sentenced to
four years' imprisonment.

On April 14, 2011, the Department of Family and Protective Services
(DFPS) took custody of R.N.W. and filed suit, seeking termination of R.L.B.'s and
D.C.W.'s parental rights to R.N.W. and appointment of DFPS as temporary
managing conservator.  The trial court appointed DFPS temporary managing
conservator, ordered R.N.W.'s continued removal, and ordered R.L.B. and D.C.W.
to comply with DFPS's service plan during the pendency of the suit.

On November 13, 2012, the termination suit proceeded to trial.  Before
hearing testimony, the trial court terminated R.L.B.'s parental rights based on her
affidavit of relinquishment.  DFPS informed the trial court that it would pursue

2

termination of D.C.W.'s parental rights under §§ 161.001(1)(D), (E), (F), (N), (O), and (Q) of the Family Code. Five witnesses testified: (1) Sheena White, a caseworker at DFPS; (2) Corinne Lundstrum, a volunteer with Child Advocates and R.N.W.'s guardian ad litem; (3) D.C.W.; (4) Jewel Hchan, D.C.W.'s mother; and (5) Jacqueline Redeau, D.C.W.'s aunt.

After hearing all the testimony, the trial court terminated D.C.W.'s parental rights under § 161.001(1)(N), (O), and (Q) and made an express finding that termination of D.C.W.'s parental rights was in R.N.W.'s best interest. After his motion for new trial was denied, D.C.W. appealed.

## Discussion

In his four issues, D.C.W. argues that the evidence supporting the trial court's termination of his parental rights to R.N.W. was legally and factually insufficient.

### A. Standard of Review

In a case to terminate parental rights by DFPS under § 161.001 of the Family Code, DFPS must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the

truth of the allegations sought to be established." *Id.* § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In a legal sufficiency review in a parental-rights-termination case, the appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In a factual sufficiency review, the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). By focusing on whether a

reasonable jury could form a firm conviction or belief, the appellate court maintains the required deference for the factfinder's role. *Id.* at 26. "An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.* We should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

**B.    Termination under Subsection 161.001(1)(Q)**

In his third issue, D.C.W. argues that the evidence was legally and factually insufficient to support termination of his parental rights to R.N.W. under subsection 161.001(1)(Q).

*1.    Applicable Law*

Termination of parental rights is a drastic measure and is of such weight and gravity that due process requires that the petitioner seeking to terminate the parent's rights justify that termination by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.206(a) (2009); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). Under subsection Q, a parent's rights may be terminated when the parent

5

"knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of the filing the petition."  TEX. FAM. CODE ANN. § 161.001(1)(Q).  "Thus, if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected."  *In re A.V.*, 113 S.W.3d at 360.  However, proof that the parent is unable to care for the child is an additional requirement that is not met by showing incarceration alone.  *In re B.M.R.*, 84 S.W.3d 814, 818 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) ("Terminating parental rights under subsection Q requires that the parent be both incarcerated or confined *and* unable to care for the child for at least two years from the date the termination petition is filed.").

"Because incarceration is inherently inconsistent with providing personal care for a child," the care contemplated by subsection Q includes arranging for the care to be provided by another. *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied).  Once DFPS has established that a parent's knowing criminal conduct resulted in his incarceration for more than two years, the burden shifts to the parent to produce some evidence as to how he will arrange to provide care for the child during that period.  *Id.*; *see also Hampton v. Tex. Dep't of*

6

*Protective and Regulatory Servs.*, 138 S.W.3d 564, 567 (Tex. App.—El Paso 2004, no pet.). When the parent meets his burden of production, DFPS then has the burden of persuasion to show that the parent's arrangement would not satisfy the parent's duty to the child. *In re E.S.S.*, 131 S.W.3d 632, 639–40 (Tex. App.—Fort Worth 2004, no pet.); *In re Caballero*, 53 S.W.3d at 396. Finally, when determining whether an incarcerated parent is unable to care for a child, we may consider such factors as the availability of financial and emotional support from the incarcerated parent. *In re B.M.R.*, 84 S.W.3d at 818.

### 2. *Inability to Care*

D.C.W. does not dispute that he knowingly engaged in criminal conduct resulting in his incarceration for at least two years from the date of the filing of the petition. He argues instead that the evidence was insufficient to show that he was unable to care for R.N.W. Specifically, D.C.W. argues that he established he was able to care for R.N.W. by placing her with his mother or aunt, and, therefore, the burden shifted to DFPS to show that the arrangements would not satisfy his duty to the child. He further contends DFPS failed to carry that burden.

D.C.W. correctly asserts that there was evidence that his mother, Hchan, and his aunt, Redeau, were willing to care for R.N.W. under certain circumstances. Specifically, Hchan testified that she "could take [R.N.W.] if [R.N.W.] wanted to come." Redeau likewise testified that she was willing to care for R.N.W. if

R.N.W. wanted to live with her. But DFPS presented evidence that D.C.W's proposed arrangements with either Hchan or Redeau were inadequate to satisfy D.C.W.'s duty to R.N.W.

To begin, the evidence does not establish that either Hchan or Redeau agreed to assume D.C.W.'s parental responsibility to care for R.N.W. on D.C.W.'s behalf while he was incarcerated. *See In re H.R.M.*, 209 S.W.3d at 110 ("Cases discussing the incarcerated parent's provision of support through other people contemplate that the support will come from the incarcerated parent's family or someone who has agreed to assume the incarcerated parent's obligation to care for the child."). Although both testified that they were willing to have R.N.W. live with them, each qualified her testimony by saying she would do so only if that was consistent with R.N.W.'s wishes. When asked whether she thought R.N.W. should be placed with her, Hchan testified: "Being honest, if she wants to come with me, I will take her; but if she feels like she doesn't, I will not fight her." Likewise, Redeau, testified: "If [R.N.W.] doesn't want to live with me, I would respect her rights." This evidence suggests Hchan or Redeau would care for R.N.W. if R.N.W. wanted to live with them, but D.C.W. adduced no evidence to demonstrate how Hchan, Redeau, or anyone else would care for R.N.W. if—as was the case here—R.N.W. did not want to live with either Hchan or Redeau. *See In re N.R.T.*, 338 S.W.3d 667, 676 (Tex. App.—Amarillo 2011, no pet.) (considering fact that

8

grandmother had expressed reservations about accepting placement of child as evidence that father was unable during his incarceration to care for child through family surrogates).

In addition, there was ample evidence supporting the trial court's conclusion that the two proposed placements were not in R.N.W.'s best interest. D.C.W. points out DFPS did not reject either Hchan or Redeau as potential placements based on a completed home study, and he contends this is evidence that either would have made an acceptable placement. DFPS is required to investigate a proposed placement to determine if it is in the child's best interest. *See* TEX. FAM. CODE ANN. § 264.754 (West 2008) ("Before placing a child with a proposed relative or other designated caregiver, the department must conduct an investigation to determine whether the proposed placement is in the child's best interest."). But, even if one is completed and approved, a home study is not binding on the trial court. *See In re G.C.*, No. 01-12-00935-CV, 2013 WL 816440, at *6 (Tex. App.—Houston [1st Dist.] Mar. 5, 2013, no pet. h.) (mem. op.) (rejecting appellant's argument that DFPS wrongly denied his mother's home study because "even an approved home study would not have been binding on the trial court"). Rather, in considering a potential placement, a court may weigh evidence other than the results of a home study, including the child's expressed wishes and the nature of the relationship between the child and the proposed

9

placement. *See In re A.L.*, No. 13-01-388-CV, 2002 WL 34230855, at * 5–6 (Tex. App.—Corpus Christi Aug. 22, 2002, no pet.) (finding that appellant was unable to care for children, in part, based on children's expressed desire to remain with foster family and not to be placed with appellant's family); *In re G.C.*, 2013 WL 816440, at *6–7 (considering evidence that grandmother had not seen or had any other contact with child in several years).

Here, ample evidence weighed against the proposed placements. First, White, the DFPS caseworker, testified that R.N.W. did not want to be placed with Hchan, Redeau, or anyone in her father's family. *See In re A.L.*, 2002 WL 34230855, at * 5–6 (finding that appellant was unable to care for children, in part, based on children's expressed desire to remain with foster family and not to be placed with appellant's family).

Second, White and Lundstrum testified that they would not recommend either proposed placement. White testified that DFPS did not conduct a home study on Hchan because Hchan informed a DFPS caseworker that she had a history with child protective services and had been charged with possession of heroin and cocaine twenty years ago. According to White, placement with someone who has a history with CPS would not be appropriate. Lundstrum, R.N.W's guardian ad litem, also testified that she would not recommend placing R.N.W. with Hchan. While DFPS did complete a home study on Redeau, White testified that it was

10

withdrawn after R.N.W. expressed that she did not want to live with Redeau. And Lundstrum testified that Child Advocates would not recommend a placement for R.N.W. if R.N.W. clearly expressed a desire not to be placed there.

Third, the evidence showing that neither of Hchan nor Redeau had a past relationship with R.N.W. supports a finding that placement with them would be inappropriate. *See In re N.R.T.*, 338 S.W.3d at 676 (considering evidence that grandmother had previously expressed reservations about accepting placement, she had neither seen nor had any other contact with child in several years, and she did not know where child was); *In re G.C.*, 2013 WL 816440, at *6–7 (considering evidence that grandmother had not seen or had any other contact with child in several years). Hchan admitted that she has seen R.N.W. about twice in the last five years. Redeau, who suffers from several medical problems, including diabetes, high blood pressure, thyroid problems, and liver problems, admitted that she had never before met R.N.W.[1]

---

[1] To the extent that D.C.W. is arguing he was able to care for R.N.W. himself, we find sufficient evidence to the contrary. When determining whether an incarcerated parent is unable to care for a child, we may consider such factors as the availability of financial and emotional support from the incarcerated parent. *In re B.M.R.*, 84 S.W.3d at 818. As evidence of the unavailability of financial and emotional support from D.C.W., DFPS presented the testimony of White, who stated that, although D.C.W. had sent R.N.W. a few letters, he had had no contact, in person or over the phone, with R.N.W. since his incarceration. White also testified that she had no knowledge of any financial support or gifts provided to R.N.W. by D.C.W. while incarcerated. She also testified that R.N.W. had no desire to be placed with her father.

11

After considering all of the evidence, including R.N.W.'s desire not to be placed with her father or any of her father's relatives, the absence of a past relationship between R.N.W., on the one hand, and D.C.W., Hchan, or Redeau, on the other, and other testimony to the effect that placement with Hchan or Redeau was not recommended, we conclude that the trial court could have reasonably formed a firm belief that the placements proposed by D.C.W. were inadequate to satisfy D.C.W.'s duty to R.N.W. Therefore, we hold there is legally and factually sufficient evidence to support the trial court's finding that D.C.W. was unable to care for R.N.W., either himself or through family surrogates, while incarcerated. *See In re N.R.T.*, 338 S.W.3d at 675–76 (finding evidence legally and factually sufficient to support finding that appellant was unable to care for child during incarceration where grandmother said she was willing to accept placement of child, but home study was not approved, grandmother had previously expressed reservations about accepting placement, grandmother had neither seen nor had any other contact with child in several years, and grandmother did not know where child was); *In re G.C.*, 2013 WL 816440, at *6–7 (holding evidence legally and

---

Further, D.C.W. admitted that he did not have much of a relationship with R.N.W. prior to being incarcerated because R.L.B. would not let him spend much time with her. He testified that he finally got to know R.N.W. after he completed his eight year sentence, at a time when R.N.W. was about nine years old. He acknowledged that he had been out of prison for a total of thirty months of R.N.W.'s life, and that he had spent only about five months of that time with her.

12

factually sufficient to support trial court's finding that appellant was unable to care for child while incarcerated when appellant had no means of caring for child, except for through his mother, appellant's contact with child was limited to three letters sent to DFPS, and appellant's mother, who expressed willingness to care for child, but who had not seen the child in several years, was rejected by DFPS as acceptable placement); *In re A.L.*, 2002 WL 34230855, at \*5–6 (holding evidence legally and factually sufficient to support finding that appellant was unable to care for children when children expressed desire to remain with foster family and not to be placed with appellant's family, home study on appellant's sister was denied, and sister was already caring for four other children and mother, who was elderly and ill).

We overrule D.C.W.'s third issue. Because sufficient evidence of only one predicate finding is necessary to support termination, we need not address D.C.W.'s remaining arguments relating to termination under section 161.001(1)(N) and (O).

## C. Best Interest of the Child

In his fourth issue, D.C.W. argues that the evidence was insufficient to support the trial court's finding that termination of his parental rights was in R.N.W.'s best interest.

*1. Applicable Law*

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). The same evidence of acts or omissions used to establish grounds for termination under subsection 161.001(1) may be probative in determining the best interests of the child. *Id.* Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2008). A court should consider the following factors, among others, when determining whether the parent is willing and able to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; whether the child is fearful of living in or returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services; and whether the child's family demonstrates adequate parenting skills. *Id.* § 263.307(b).

14

The Texas Supreme Court has set out additional factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual to promote the best interest of the child; (6) the plans for the child by the individual or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list is not exhaustive, and there is no requirement that DFPS prove all of the factors in order for the court to make a valid finding on the best interest of the child. *In re A.A.A.*, 265 S.W.3d at 517.

### 2. *Analysis*

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of D.C.W.'s parental rights was in R.N.W.'s best interest. First, evidence of R.N.W.'s desires, her present and future emotional and physical needs, and D.C.W.'s ability to parent R.N.W. and provide for her needs all support termination. The record reflects that R.N.W., who was almost thirteen at the time of trial, did not want to be placed with her father or any

15

of her father's relatives. Additionally, D.C.W. admitted he did not have much of a relationship with R.N.W and had spent only about five months with her since she was born. And White testified that although D.C.W. had sent R.N.W. a few letters while incarcerated, he did not have any contact with her over the phone or in person, and he had not provided her with any gifts or other financial support. From this evidence, the trial court could have reasonably concluded that D.C.W. has not been able, and would not be able after being released from incarceration, to provide for and support R.N.W.'s physical and emotional needs. *See In re G.C.*, 2013 WL 816440, at \*9 (finding that appellant lacked of ability to provide for child's present and future emotional and physical needs when appellant had no contact with child, and had not sent any letters, pictures, gifts, or financial support while incarcerated).

We also consider whether there is a history of abusive or assaultive conduct by the child's family, as well as the emotional and physical danger to the child, now and in the future. Both exist here. First, the record reveals D.C.W. has a history of abusing R.L.B., R.N.W.'s mother. D.C.W. was convicted of assaulting R.L.B. in 2000, when R.N.W. was just eight months old. After serving his eight-year sentence, D.C.W. was out of prison for about twenty-two months before he was again charged with assaulting R.L.B. He pleaded guilty to assault of a family member and was sentenced to four years' imprisonment. D.C.W. testified that

16

R.N.W. was at home when the second assault on her mother occurred, and that R.N.W. knew that he and R.L.B. were arguing. Second, White testified that, because of D.C.W.'s criminal history, DFPS was concerned that something might happen to R.N.W. if placed with D.C.W. Based on this evidence, the trial court could have reasonably concluded that D.C.W.'s history of abusive conduct toward R.N.W.'s mother would put a child in his custody in emotional and physical danger now or in the future. *See In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—Amarillo 2003, pet. denied) (holding termination of parental rights of mother and father in best interest of child because father was physically abusive, mother had failed to protect child from father, and both parents had been in jail for all of child's life).

In addition, we may consider the parent's acts or omissions indicating that the parent-child relationship is not a proper one, as well as any excuse for the parent's acts or omissions. As previously noted, D.C.W. has spent about five months with R.N.W. since her birth. And since being incarcerated, he has made only minimal attempts to contact R.N.W. This history of limited contact during and after extended periods of incarceration supports the trial court's finding. *See In re B.M.R.*, 84 S.W.3d at 821 (concluding evidence supported finding that parent-child relationship was not proper when appellant spent no more than thirty-

one hours with child before going to prison and had limited contact with child since being incarcerated).

Finally, we consider the plans for the child by the agency seeking custody and the stability of the home or proposed placement. The record reflects that D.C.W. has been incarcerated for assaulting R.N.W.'s mother for all but thirty months of R.N.W's life. This has left R.N.W. without a stable environment and without any reliable source of emotional or physical support. White testified that R.N.W. is currently in a foster home and has been in that home for about a year and a half. White testified that R.N.W. is doing very well in the home and "she loves it there." She also testified that the current placement with the foster family is stable, and that the family has committed to keep R.N.W. long-term, until a permanent adoption can be made. In light of this evidence, the trial court could have reasonably formed a firm belief that termination was in R.N.W.'s best interest, even though DFPS has not yet identified a permanent placement for R.N.W. *See In re C.H.*, 89 S.W.3d at 28 ("[T]he lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor [in a best interest analysis]; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located."); *see also In re G.B. II*, 357 S.W.3d 382, 384 (Tex. App.—Waco

2011, no pet.) (finding that DFPS is not required to make placement with relative before party's parental rights may be terminated).

In sum, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that the termination of D.C.W.'s parental rights was in R.N.W's best interest. *See In re S.M.L.*, 171 S.W.3d 472, 480–81 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding evidence legally and factually sufficient to support finding that termination of father's parental rights was in best interest of child when child had bonded with foster parents, child had not bonded with father, father was incarcerated and had pattern of violent criminal conduct, and father did nothing to maintain any relationship with child during incarceration); *In re B.M.R.*, 84 S.W.3d at 820–21 (holding evidence legally and factually sufficient to support best interest finding when father's criminal history caused concern for safety of child in future, father had history of not seeing child for long periods of time and not providing financial support, father spent no more than thirty-one hours with child from her birth until when he was incarcerated, and, while incarcerated, father had made only minimal attempts to maintain contact with child).

We overrule D.C.W.'s fourth issue.

## Conclusion

We conclude that legally and factually sufficient evidence supports the termination of D.C.W's parental rights under section 161.001(1)(Q) of the Family Code and the trial court's finding that termination was in R.N.W.'s best interest. Accordingly, we affirm the judgment of the trial court.


Rebeca Huddle
Justice

Panel consists of Justices Jennings, Brown, and Huddle.